# Fields *v.* The State.

### Indictment for Murder.

1. *Russell circuit court ; authority of at special term.* — The circuit court of Russell had authority to compel the trial of a criminal case at the special term, held under the act of December 11th, 1874, although the case had been regularly reached and continued at the preceding regular term.

2. *Venire ; what not ground for quashing.* — The want of qualification of any of the persons summoned as jurors is not ground for quashing the *venire ;* neither is the fact that one or more of them were designated by the initial letters of their christian names instead of their full christian names, especially when defendant has not been thereby deceived or misled.

3. *Murder in second degree ; what definition of not erroneous.* —A definition of murder in the second degree as " the unlawful killing of a reasonable person with malice aforethought, either express or implied," is not erroneous.

[Fields v. State.]

4. *Conviction for lower degree of murder; acquittal of higher.* — Where defendant has been convicted of murder in second degree, and obtains a reversal, he cannot afterwards be put on trial for the higher degree.

5. *Murder in second degree; charge as to, what erroneous.* — A charge that " murder in the second degree includes those cases of constructive murder which are not accompanied with the intent to take life, but are committed by gross carelessness, or in the commission or attempt to commit some other crime than arson, rape, robbery, or burglary, and that the jury cannot convict of murder in the second degree if they believe the killing was malicious, or was not committed in the commission or attempt to commit some other crime than above specified," is calculated to mislead the jury, and is properly refused.

APPEAL from Circuit Court of Russell.

Tried before Hon. J. E. COBB.

The appellant, O. A. Fields, was indicted for the murder of Jesse Dumas. He was tried at the Fall term, 1872, convicted of murder in the second degree, and sentenced to ten years' imprisonment in the penitentiary. On his appeal, this court reversed the judgment and sentence, and remanded the case for a new trial. See *Fields* v. *The State*, 47 Ala. 603.

After the reversal of the cause it was regularly continued from term to term. A special term of the circuit court was held on the 11th day of January, 1875, in pursuance of " An act to authorize the judge of the 9th judicial circuit of the State of Alabama to hold a special term in Russell county." Approved December 11th, 1874. The provisions of this statute are set out in the opinion. The defendant objected to being put on trial at that term, because at the regular term, in November, 1874, the case had been regularly reached and continued. The court overruled this objection, and the defendant excepted. The defendant then moved to quash the *venire*, " upon the ground that all of the jurors summoned for his trial were not residents of Russell county, and offered to introduce proof on this point which the court refused to allow, and without hearing proof overruled the motion, and defendant excepted.

In empanelling the jury one William Dawson was drawn, who stated that he was not a citizen of the State or of the United States ; whereupon the defendant again moved to quash the *venire*, but his objection was overruled, and he excepted.

When T. H. Moody, one of the jurors on the list served on prisoner, was drawn, " he stated that his name was Thomas H. Moody, and that he was commonly called Tom Moody, T. H. Moody, and Thomas H. Moody, indifferently, and that he was the person summoned by the sheriff as a juror in the case." The defendant moved the court to discard the name of Moody and substitute some other person in his place. This motion was overruled, and defendant duly excepted.

The evidence introduced on the trial was not materially variant from that given on the former trial, and reported in the

47th volume of Alabama Reports, pages 603–9.  The substance of the evidence was that at noon of the same day on which the killing occurred, the deceased met prisoner at the house of a neighbor, called prisoner a " gin-house burning, thieving son of a bitch," and on prisoner's declining to fight twisted his nose, struck him in the face with his hat, and jerked him off the steps on which he was sitting.  The prisoner made no resistance, and immediately went home.  On his arrival there he took his shot gun, fired it off and reloaded it with buck-shot in each barrel.  The deceased rode by prisoner's house, on his way home, about sundown.  The prisoner came out and shot deceased as he was sitting on his horse in the road.

The court, in its charge to the jury, instructed them that the defendant having once been tried on the indictment and found guilty of murder in the second degree, could not be convicted of any higher offence, and then proceeded to charge upon the various other grades of homicide.  To a portion of the charge, defining murder in the second degree, as well as to the refusal to give a written charge requested on that subject, the defendant duly excepted.  The charge given and that refused are both set out in the opinion, and need not be here repeated.

The various rulings to which exception was reserved are now assigned as error.

LYMAN W. MARTIN and G. W. GUNN, for appellant. — The special act authorized a term for the purpose of disposing of " *unfinished* " business.  At the special term the jurisdiction of the court was confined to business which had *not been disposed of*.  This case had been *disposed* of by a continuance.  The juror Moody should have been discarded, and another person summoned in his place.  *Bill* v. *The State*, 29 Ala. 34.  The charge given ignores the distinction between express malice and implied malice, as applicable to the different degrees of murder under the statute.  For this reason it was proper to ask the charge which appellant requested, and its refusal was error.  If *express* malice is shown, the killing cannot be murder in the second degree.

JOHN W. A. SANFORD, Attorney General, *contra.* — The act authorizing the special term is constitutional.  *Dorman* v. *The State* 34 Ala.  Appellant had no vested right to put off his case because it had been continued at the last regular term ; until an acquittal or conviction, or some order disposing of the case finally, it was " *unfinished* business."  The motions to quash were properly overruled.  40 Ala. 698 ; 29 Ala. 34.  The court did not err in refusing to exclude Moody and substitute another juror in his stead.  35 Ala. 399.  The charge given was

[Fields v. State.]

correct.   Roscoe Crim. Ev. 690.   The charge refused was cal-
culated to mislead the jury.   48 Ala. 159 ; 24 Ala. 67.

BRICKELL, C. J. — The statute of December 11, 1874
(Pamph. Acts 1874-5, p 209), required the judge of the 9th
judicial circuit to hold a special term of the circuit court for
Russell county, on the second Monday in January, 1875, con-
tinuing for three weeks, " for the trial and disposal of all crimi-
nal and civil business left unfinished at the last regular term of
said court."   If a doubt could exist as to the character of busi-
ness over which the court at this special term had authority
and jurisdiction, — or, rather the character of the business, in-
tended to be designated as " business left unfinished at the last
regular term," — it is removed by the subsequent provisions of
the statute.   First, the court is expressly clothed " with full,
complete, and plenary jurisdiction in and over all unfinished
business, to the same extent and in the same manner as if said
special term, herein provided for, was a regular term of said
court."   Grand and petit juries are to be drawn and sum-
moned to attend its sitting.   All bail pieces and bonds for the
appearance of parties are made answerable to this special
term ; and then, as if to render " assurance doubly sure," as
to criminal causes, it is declared, " that in all indictments here-
tofore found in said circuit court, and when the parties shall
have been arrested before said special term, or during the term
thereof, the same shall stand for trial at said special term."
We cannot doubt, nor do we see how it could have been more
clearly expressed, that it was intended that the court, at this
special term, should have over the business pending, not com-
plete and put an end to by final judgment, the jurisdiction and
authority it could exercise at a regular term.   The competency
of the general assembly to authorize special terms, and to
compel the appearance of parties in civil or criminal causes, at
its sitting, cannot now be questioned.   It is a power of frequent
exercise since the formation of the state government, and its
existence is now beyond the pale of controversy.   The objec-
tion of appellant to a trial, resting solely on the ground of the
want of authority in the court, because it was a special term,
was properly disallowed.

2.   The several motions to quash the *venire* were properly over-
ruled.   The want of requisite qualifications in any of the per-
sons summoned as jurors is matter of challenge for cause, which
must be disclosed in a case of this kind before a person can be
put on the State or the accused for acceptance or rejection, and
would lead to his exclusion by the court, *ex mero motu*.   The
summoning of such persons must sometimes occur from the in-
advertence, or ignorance of facts, in the officer charged with

the duty of summoning, and is not ground for setting aside the *venire.  Hall* v. *State,* 40 Ala. 705.

Nor was it cause for quashing the *venire* that one or more of the persons named in it were designated only by their initial letters, instead of their full christian names.  *Aiken* v. *State,* 35 Ala. 399 ; *Bill* v. *State,* 29 Ala. 38 ; R. C. § 4175.  We do not approve the practice of using initials only, to designate christian names, in any paper pertaining to judicial proceedings, but it has prevailed too long to be be treated as vicious. No good reason could be assigned for sustaining the objection made on this ground to the *venire ;* it was not alleged the appellant had been misled or deceived as to the person intended to be designated ; and it did appear he was generally known by the use of initials.

3. The defendant was properly put on trial for murder in the second degree, and not for murder in the first degree.  The court, in its general charge, gave the following definition of murder in the second degree : " Every homicide which the evidence establishing it fails to show to be murder in the first degree, but which the evidence does show to be murder at common law, is murder in the second degree in Alabama.  Murder in the second degree may be defined the unlawful killing of a reasonable person, with malice aforethought, either express or implied.  Without malice there cannot be murder.  With malice as the prompting motive there is always murder."  This charge was followed by a correct definition of malice, and a to statement of the evidence of it.  The appellant excepted so much of the charge as defined murder in the second degree, and requested the court to charge : " That murder in the second degree, under our statute, includes those cases of constructive murder which are not accompanied with the intent to take life, but are committed by gross carelessness, or in the commission or attempt to commit some other crime than arson, rape, robbery, or burglary ; and that if they believe, from the evidence, that the killing was malicious, or was not committed in the commission or attempt to commit some other crime than the above specified, they cannot convict the prisoner of murder in the second degree."  This charge was refused and an exception reserved.

4. Murder was defined, or rather described by Sir Edward Coke, in these words : " When a person of sound memory and discretion unlawfully killeth any reasonable creature in being, and under the king's peace, with malice aforethought, express or implied."  The description was adopted by Blackstone.  4 Black. 195.  There were degrees of criminal homicide at common law, but malice was the distinguishing characteristic of murder.  A malicious killing, whether the malice was express

or implied, — whether it was the result of a sedate, deliberate
mind, and formed design; or whether malice was implied from
the circumstances attending the killing, — was murder, of equal
criminality, and subjected to the same punishment.   The as-
sassin who lay in wait with a murderous weapon, and by sur-
prise or stealth took the life of his victim, was not deemed
more criminal than he who, without adequate provocation, in
unbridled passion, took human life.   The one only furnished
more indisputable evidence of his guilt than the other.   The
mind could not resist the conviction that they were not equally
criminal, and should not be subjected to the same severity of
punishment.   The statutes of this State, without changing the
common law definition of murder, without adding to or taking
away any of its ingredients, as known to the common law, for
the purpose of punishment only, have divided it into murder in
the first and murder in the second degree.   The malignity with
which the crime is perpetrated is the criterion by which the one
is distinguished from the other degree.   " Every homicide per-
petrated by poison, lying in wait, or any other kind of wilful,
deliberate, malicious, and premeditated killing; or committed
in the perpetration of or the attempt to perpetrate any arson,
rape, robbery, or burglary; or perpetrated from a premeditated
design, unlawfully and maliciously to effect the death of any
human being, other than him who is killed; or perpetrated by
any act greatly dangerous to the lives of others, and evidencing
a depraved mind, regardless of human life, although without
any preconceived purpose to deprive any particular person of
life, is murder in the first degree; and every other homicide
committed under such circumstances as would have constituted
murder at common law is murder in the second degree."   R. C.
§ 3653.   The killing in any sudden rencounter or affray, by
the assailant, with a deadly weapon, which was concealed before
the fight, the adversary having no deadly weapon drawn, is
murder in the second degree, and may, according to the circum-
stances, be murder in the first degree.   R. C. § 3656.   A care-
ful analysis of murder in the first degree, as described in the
statute, resolves it into three characteristic ingredients.   The
first is a specific intention to take life, whether it be the life of
the person slain, or of some other human being, deliberately
formed and acted upon.   The sedate and deliberate mind and
formed design of the common law, manifested by lying in wait,
or by poisoning, or by any other evidences of wilfulness, delib-
eration, premeditation, and malice.   What these evidences may
be, cannot be defined.   They spring from the particular facts
and circumstances attending the killing.   When the killing is
perpetrated in the committing or the attempt to commit the

crime of arson, rape, robbery, or burglary, it is murder in the first degree. The criminal intent which is involved in these offences gives complexion to the unlawful killing perpetrated in their commission. It supplies the malice of the common law, and the specific intention to take life, involved in the other homicides mentioned in the statute. Then, the reckless depravity which at common law imported malice, and which is the equivalent of malice, directed to a particular person, illustrations of which are given in the common law books, " as the going deliberately, and with intent to do mischief, upon a horse used to strike, or coolly discharging a gun among a multitude of people, is presumed to exist." 4 Black. 200.

All other unlawful and malicious killings the statute denominates murder in the second degree. They embrace the homicides in which malice was implied at common law. An affray may have occurred, or a provocation been given, which if acted on in the heat of the passion it would suddenly produce, the law, in tenderness to human frailty, would receive as mitigating an unlawful killing to manslaughter. If, however, the provocation, however sudden, was not of that character which would in the mind of a just and reasonable man stir resentment to violence endangering life ; or if between the time it was given and the killing, " cooling time," as it is quaintly and forcibly expressed in the older books, — time in which passion would have subsided unless wrath had been nursed, — intervened, the killing would be murder. The malice was implied, because violence was carried too far, or because it was supposed the provocation was seized upon to gratify revenge. Such a homicide may also have been attended with evidences of express malice, as in the preparation for the killing, or the weapon employed, or some other evidence of it. Yet, the provocation may rebut the existence of the wilfulness, deliberation, premeditation, and malice, which must concur in murder in the first degree. A killing may also be reckless, without evincing a purpose to take the life of any particular human being, and without evincing the degree of depravity shown in the illustrations we have mentioned. There may be no purpose to do mischief; as if one from a house-top recklessly throws down a billet of wood upon the sidewalk, where persons are constantly passing, and it fall upon a person passing by and kill him. Moore v. State, 18 Ala. 532. No more accurate definition of murder in the second degree can be given than that found in the statute, — a malicious and unlawful killing under other facts or circumstances than those enumerated as constituting murder in the first degree. The charge given by the court was of consequence correct. The charge requested was properly refused. It would have misled the jury into the supposition

[McIntosh v. State.]

that no other homicides than those it specifically enumerates were murder in the second degree.

The judgment must be affirmed.

